We will hear argument next in number 13-3. This case involves and concerns government overreach, hyperbole, and exaggeration. Hannah Harding was an assistant cook. She was a Wage Grade IV employee at the United States Naval Academy. She had 24 years of unblemished service, no prior discipline, and in fact many complimentary declarations in her annual performance evaluations by her various supervisors. She is consistently described as a dedicated, dependable, and good employee. In a one-off incident on the day of her wedding, she is driving on a naval support activity. She works at the United States Naval Academy across the Severn River. Ms. Harding in this case, while she's- Can I ask, is that naval support activities that you're talking about, is that open to the public or only to naval employees, or some third answer? No, my own experience, because I've driven there, is there's a gate, but there's no- I was permitted on there, even though I'm a civilian and don't have any credentials. I don't have any Navy credentials or military credentials. You were permitted on, did you just drive through or did you stop and demonstrate? No, as I recall, there was a gate there, I mean there was a guard post there, but there was no gate and it was not manned, so it's an open facility. So Ms. Harding, while she's off-duty for a purpose totally unrelated to her job, she went there to get a key for the room where her wedding reception was going to be held that night. She's stopped by an officer, a Navy police officer, and she's charged with driving under the influence of drugs and or alcohol. And based on this, the Navy removes her from federal service. Now, there are three major components to the question we present to the court. We believe there are due process violations, that they've been preserved and they're properly before this court. We believe that the Navy did not prove sufficient nexus and we believe that the penalty is beyond the bounds of reasonableness. And those are the three things I would like to address this morning. First of all, let me describe her work. As I said, she's a wage-paid clerk. She's an assistant cook. Yes, sir. Well, on the nexus issue, I mean, she's off-duty and all that stuff, but isn't there a fair amount of case law, at least from the board, that illegal drug use is presumed to be nexus? The government has a drug-free policy. You can't be a federal employee and take drugs. So, you've got, I think, a good argument that this was off-duty and not related to her job duties, except for that line of cases that says illegal drug use is per se nexus. You know, I think that there's still, I think the board law is broader than that. I think it also talks about essential and significant connections with the job. In this case, first of all, I think there's a fair dispute about whether, what Ms. Harding was under the influence of, because they smelled alcohol on her breath. Oh, I completely agree with you on that. There's a very big dispute that at the time she was pulled over, she was under the influence of drugs, but she admitted that she used cocaine. Yes, the night before. Again, I think the way I read this precedent is that drug use without any relation to on-the-job job duties and the like is per se nexus. I understand. Am I reading that case law wrong? Well, I think that case law can't be taken in isolation. I still think that the government had to show that there was some relationship between the drug use and her actual duties. You see, the same facts- Are you talking now in terms of nexus or in terms of penalty? Well, I was just going to say- Because it seems to me you have a far better argument on penalty in the Douglas factors than you do on nexus. I was just going to say that the same set of facts regarding what Ms. Harding did, both the misconduct and the job duties that she had, does in fact go to the penalty. So let me address the penalty, the reasonableness of the penalty. Can I just say one question about- I think it's more a nexus question. I'm not entirely sure before you move on to the penalty. And it connects to the question I asked you about whether access to the residential area where she was driving is controlled or not. Would it be a sufficient nexus, if that area were controlled, that her having a job at the Naval Academy would in fact continue to give her access to this area where families were living, driving under the influence and thereby creating a danger? Forget about the tasks of being a cook. Well, I think that raises the question, if a federal employee- it's related to Judge Hughes' question- let's say that a federal employee is driving on the Baltimore-Washington Parkway or Clara Barton Parkway or any highway that traverses federal property, which is pretty easy to do in this area. Is that sufficient nexus? And that is setting aside that it's the drug use question. Let's say that it was simply a drunk driving, an alcohol-related offense. Would that fact be enough? It's clearly government property. But I think that the law is that it not only has to be government property, you have to show more than the fact that it was government property. I mean, if I go to a concert on a national- Well, you'd have a much better case if this was just drunk driving because the comparable penalties for people being under the influence of alcohol are far lower here than people using drugs. It's really the drug use that is your client's problem. Certainly the criminal penalties are different. So the table of penalties for the Navy is not quite so different, if I may say that. I'm sorry, Lenny, you can get back to the- I interrupted you in getting to the penalty and the- The penalty case, yeah. Let me talk a little bit about that. The penalty- first of all, let's look at reasonableness. And I think that starts with looking at the Navy's own table of penalties. This is what the Navy decided is reasonable when somebody uses drugs. It's 14-day suspension to removal. Now, as a matter of simple logic, one has to say that removal, the most severe penalty, is for the most severe case. There has to be a gradation. That's- not every case has the same significance or is of the same degree. But what the decision-maker, I think, pretty explicitly said was, if you start from the illegal drug use perspective, and that's one starting point, but not the only one, then you have this range, the upper end of which includes removal. And then you add in the fact that she was driving under the influence in a residential area. You can view that as creating a real danger of killing people. Well, why does that not- why is that not sufficient within the range of discretion to say it's going to be at the upper end? Because you have to look at all the facts. And the facts are that Ms. Harding was stopped because a clerk had smelled alcohol on her breath, had reported it. She happened to drive by a police officer who was there for other reasons. She was not committing a separate traffic offense. She hadn't rolled a stop sign or a red light or been speeding. There's no allegation that she was driving recklessly. There's no allegation that she was driving negligently. If you're saying that per se use creates a danger, then we're talking about something different. But I think in this case, you have to prove the danger. Now, the endangerment is critical. Well, don't you think that driving under the influence of alcohol is inherently dangerous, notwithstanding whether there happens to be an ongoing violation of a traffic law? I think that there are any number of activities that are inherently dangerous, but that doesn't automatically trigger a maximum penalty, especially when the agency talks about a range of penalties. Now, I'm going to try to focus on a couple different things here. In terms of the reasonableness of the penalty, not only do we have this range, but let's look at what the people who worked with Ms. Smith and her supervisors, there was testimony by both the immediate supervisor at the time this incident occurred that supervised her regularly, and the supervisor had been in charge of her in prior years. Both of them said she was an exemplary employee. Her second level supervisor said that when he was asked, his recommendation was that she be given a last chance agreement, not that she be removed from federal service. All this goes to reasonableness. These are people acting for the Navy who know her the best. This is Mr. Cook, right? Are you talking about Mr. Cook? Oh, sorry, that may be the wrong person. No. It's the Director of Food Services. Right. That's who I think I'm talking about. I'm probably looking at the person. I'm blanking on his name, too. Well, I think it actually is Mr. Cook. I'm looking at page A56 of the Joint Appendix, and then this is that. Mr. Cook is the attorney for the Navy. That's his question. Okay. Yeah, yeah. He's asking questions. I can't tell who he's asking questions of, but I think it's the person you're talking about because it has that in mind, but I understand he said he would have offered a last chance settlement agreement, but didn't he go on and say that he'd actually be really nervous about her working there because he'd be worried that she would be under the influence or not? And on cross-examination, he was asked, but you didn't have that concern when you proposed the last chance agreement, did you? So he's conceding. I mean, it's command influence that he's conceding that, you know, his boss wanted something else. He's not going to come into a hearing and say to the contrary. But I think in terms of, again, let me talk about endangerment because we were talking about that as the inherent risk involved in driving while under the influence. The endangerment was never noticed in the proposal. It is clearly an aggravating factor. It must be noticed in the proposal. If it's not noticed in the proposal, then there's a plain due process violation and the entitlement is to, you know, is to redo. You cannot sustain a removal based on the consideration of factors that were not noticed in the proposal. And there's no question that there's nothing in the proposal that refers to endangerment, nothing. And yet it's used maybe four or five times in the decision. Now, the other thing that's apparent is that the other Douglas factors to address what you had implied. Isn't that why we have laws against drunk driving? Because of the danger? Well, I mean, it seems to me if there's anything that follows this night to day, it is that drunk driving is dangerous. And that's, is that wrong? Well, no, it's not wrong to prohibit that. Well, no, but is it not correct to say when you say that somebody has engaged in drunk driving and this is the charge I'm leveling against you that one of the reasons that drunk driving is a bad thing, which I am going to punish you for, is because it entails inherently danger to others. And it's dependent on any number of factors. And when, you know, in criminal courts, the courts look at, you know, how drunk were you? In this case, we have no evidence of that, okay? We have field tests, but with the chemical tests. Well, I'm addressing the due process question, that there was a requirement to actually separately allege that there was a danger associated with drunk driving. And I'm not seeing why alleging drunk driving isn't inherently a dangerous conduct. Because Ms. Harding had no idea what was meant by endangerment. Is it the general proposition that you're stating, or is it something more specific? I mean, the evidence in this case is there was nobody present. There weren't any people around where she was driving. As I mentioned before, there's no evidence that she was operating her vehicle negligently. There's no evidence. Except for the fact that she failed the field sobriety test. Right, but not that. I mean, can't we presume if she failed the field sobriety test, she's operating her vehicle negligently? The fact that she was very fortunate that there were no people around, and that, you know, she may not have been so impaired as she was swerving and the like. But the failure of the field sobriety test has to suggest that she was impaired. But then again, I think that goes to the reasonableness of penalty. Were those factors considered? Did she have a chance to address the issue of severity based on the degree of, excuse me, the degree of alleged negligence or alleged risk that she was taking? She didn't have the opportunity to respond to any of those things, and that's why there's a due process issue in this case. I say that my time is virtually up. I did reserve some for rebuttal, but I have the clock started at the... We'll restore, what, four minutes. Thank you, sir. I appreciate it. Thank you, judges. May it please the court. The court should affirm the arbitrator's decision because he correctly determined that the Naval Academy did not abuse its discretion in imposing removal as the penalty for Ms. Harding's misconduct. It is clear what the nature of the misconduct was in this case. As identified in the charge... Before you get too far into your argument, can I just ask you, on page 31 of your brief, you say she used crack cocaine. That's not right, is it? She didn't admit to using crack cocaine. I think she admitted to snorting cocaine. I mean, this is not relevant, except that it seems to me that by referencing crack cocaine, you're trying to paint this in a worse light than it is. I mean, it's a little inflammatory. I agree that's an error. Sorry, I just... I mean, this is important. You shouldn't do things like this. You have your case and you have your arguments, but mischaracterizing the record is something that... I apologize for that. I hadn't noticed it until you pointed it out. The testimony was that she admitted snorting cocaine. The nature of the misconduct is clear. She admitted snorting cocaine and being under the influence of drugs or alcohol when operating a motor vehicle. That was the testimony from the police officer, that she was under the influence of either drugs or alcohol when operating the motor vehicle. With regard to the Douglas factors, the arbitrator correctly determined that there was no abuse of discretion. Can I ask you just on the nexus question before one gets to the Douglas factors on the appropriateness of the penalty? Come back to the question that I started with. Is, in your view, or does the record tell us, is the simple fact that she would continue to be employed by the Naval Academy, regardless of the tasks to be performed, something that would give her access to this area where she was driving? And if so, was that a basis for the connection of the danger to her continued employment? Or is it all about what it would mean for her to continue to be employed for the general atmosphere of enforcement of an important rule and cook responsibilities? I think the short answer to your question is yes. In the deciding official's decision, he specifically referenced that he was unwilling to have her come onto the facility. He was unwilling to have that happen in the future. Which facility was he talking about there? Was he talking about the Academy, the support facility, or both? As you understand it, I think that was left out of the way. He doesn't make a distinction, but her being an employee, she would need to come onto the facility to do her job. The actual Academy. Onto the Academy, certainly. And the Academy, I take it, is more or less exclusive, closed to outsiders. Certainly, one can take a tour. Right, but assuming that you're not on a tour. I can't simply drive through the premises, I take it, if I recall correctly. That's not. Correct. But to answer your question, that was part of the decision by the deciding official, that in order to do her job, she needed to come onto the facility. And he was not willing to give her access to the facility as a civilian. He also, the deciding official weighed most heavily the nature of the misconduct, the seriousness of the misconduct. The fact that she was operating a vehicle under the influence of either drugs or alcohol in an area that had military housing and a children's playground. This is an area where people reside. Yes, it's true, there was no one out there at the time in question, other than the police officer in his vehicle. But still, this conduct occurs of using illegal drugs and alcohol, and then thereafter coming onto the- Isn't it the drug use that was the key to his decision? Excuse me? I mean, isn't it really the drug use that was the key to his decision, not so much just operating a vehicle under the influence? I mean, if you look at consistency of penalties, if you're relying on operating to influence, I think you have a hard time. I mean, they pointed out that sailing instructors teaching Naval Academy people sailing were suspended for 14 days while operating under the influence. So it can't be the operating under the influence of alcohol that led to the maximum penalty here. It had to be the drug use. It's all of the circumstances. I agree that it is essential that there be the illegal drug use. But there was, as the deciding official cited in his decision, the fact that she came onto the facility intentionally, drove- Sure, but if you compare that to a sailing instructor teaching sailing under the influence of alcohol, that seems far worse, and those people got 14-day suspensions. I have a real problem with the penalty here. This seems like a seriously inconsistent- it seems seriously over the top for what the offense was. It's not over the top, because first of all, as the deciding official stated in his decision and in his testimony, he was looking at all of the circumstances. What she did here is display extraordinarily bad judgment. You have no disagreement for me on that. What I'm worried about is the consistency of the penalties. I know that I'm looking at page 838 and 839, which is the deciding official's Douglas analysis, and I know he said he looked at them. But can you show me in the record where he actually demonstrated some knowledge? Because all I could find in his testimony was that he thought he'd looked at it and he thought he'd heard of one similar incident. But if you look at all the various penalties that the union has provided, it seems to me that if he had looked at those seriously, he would have considered this to be disproportionate. In terms of his testimony, he testified that they brought one case to his attention. He believed it was from January 2009, that he did not regard it as being similar to the circumstances of this case, and that he did not rely upon it. That was his testimony. Now with regard to the testimony that was presented concerning the other incident. Do you have any idea what that case was? It perhaps can be the incident from January of 2009, which is addressed at page 200. That's the employee that was arrested for possession of crack with an intent to distribute, right? It could be that case. If we're talking about the January 2009 case, that's the January 2009 case. Right. And that employee was removed. Yes, that employee was removed. But that seems to me to be pretty distinguishable from what we have here. Possession with intent to distribute is a pretty serious felony. The deciding official did not regard that case as being similar. He said that. But that's the case. That's the only case I see where there was a removal, I think, for drug use. I don't see any other similar case involved where there was a removal for one incident of drug use. Am I right? The other incident that involved drug use was from September 2009. That's a drug use. That's another intent to distribute case, though. That's correct. That's correct. I'm not saying that they are comparable. The deciding official testified that the one case that he did look at, he didn't view as being comparable. Do we have any comparable, I'm sorry, any cases that are being asserted to be comparable? Yes. I'm sorry. The award. No, no, no. Can I finish? I'm sorry. I take a pause in the middle of my sentences often. I'm sorry about that. We have many assertedly comparable cases. And what I'd like you to tell me is, do any of them involve a combination of illegal drug use and driving a vehicle under the influence? No. There were eight cases brought to the arbitrator's attention. Two of the cases that the court has already alluded to from January 2009 and September 2009, that involved cocaine. The arbitrator concluded that the only one that approached being comparable was the January 2009 case. But he did not find that it was. And that was the removal? That was a removal. That resulted in a. And what, again, the other cocaine case was the September 2009? Yes. Yes. And what was the disposition of that case?  In lieu of removal, as I recall. Right. In both of those cases, it was a removal. In both of those two cocaine cases, the immediate action by the agency was to put the employee on an indefinite suspension, which the agency can do immediately, and then go on to take further action. And there was an indefinite suspension followed by a resignation in the September 2009? Correct. Correct. There were four cases involving just alcohol only. They are summarized on page 200 of the appendix. And we have additional sites regarding those in our brief. Can you just tell me, did those involve driving under the influence? No. They were all being drunk on campus or something? Being under the influence or consuming. One incident was consuming beer at a function where the individual was not supposed to be drinking, whether they were under the influence or not. And what's the sailing case that Hughes was describing? The sailing case? I'm not exactly sure. But there were four cases involving alcohol that are laid out on page 200. 200. Thank you. Can I turn you to another one of the double specters? It seems like the almost universal testimony of the supervisors that worked with her was that she should be given an opportunity to return. The only person that decided firmly that she shouldn't be allowed to return is the commandant. And so is there really substantial evidence to support the conclusion that this offense had an effect upon her supervisor's confidence in her? It certainly had an effect on the commandant's confidence. He testified that he was affected. Also, Mr. O'Malley, who was the director of the food services division at the time, he testified that he would be nervous having her working for him. That's that passage I discussed with your colleague. I understand that. It's a pretty equivocal passage, though, since he also admits that he would have given her a last chance settlement agreement, and that the only thing is that there wasn't really anything that had changed his mind about that. So maybe that's enough. Although, I assume in your view, the commandant's opinion alone is enough to show lack of supervisor confidence. Yes. But what was really important in his decision, as shown in the decision letter, was the magnitude of the offense. The fact that the conduct itself, that she used the illegal drug, she drank, and then made the decision to go onto the Naval Support Activity, intentionally went on there. It really just strikes me that it may be that there's nothing I can do about it, but that he gave really short shrifts to the fact that she had 24 years of an unblemished work record, and she made a colossally bad decision on one night that caused her removal, and I assume caused her to lose any chance at a pension or the like. In his mind, he gave the greatest weight to the nature and the seriousness of the offense. And this court has said that the weight to be given to a Douglas factor is a matter within the agency's discretion. And here, he weighed the factors. He noted that she had all these years of service and an unblemished record, but he was simply not willing to take the chance of any future misconduct in light of the seriousness of the misconduct that she had. Do you have any idea if she was allowed to apply for some kind of discontinued service annuity? Excuse me? Do you have any idea if she was allowed to apply for any type of discontinued service annuity? I know that sometimes when people are terminated or the like, before they're actually eligible for retirement, they can do that. I assume that the conduct of the termination or the termination here would bar that, but I just wondered if you had any idea. I don't know the answer to that question. I don't know whether it would bar it. She certainly has all of those years of service. Court is no further. Thank you. Thank you. Mr. Galeano, you have four minutes. Thank you, Your Honor. It's clear to me that the deciding official wasn't going to hear about anything other than the fact that this incident occurred. If you look at his Douglas Factor analysis, it is either cursory, conclusory, or dismissive. He notes the 24 years of good service and says those are significantly mitigating factors, his words. Then he says, but so what? Supervisory confidence, I'm glad you raised that, Judge Hughes. You can't say, he has no confidence. He describes this as the equivalent of a dean of students. He doesn't deal with Ms. Harding. Her supervisors do. And they said, she's a dependable employee. In case law or practice, does the reference to supervisors stop at the immediate supervisors or the higher-ups who don't have the personal relationship which you might well expect to lead to a particular kind of sympathy? Does it go to the higher levels who might have a broader institutional perspective? It might, but it's their burden then to show what is the, and remember, it's supervisory confidence and your ability to perform your job. How can you ignore 24 years of exemplary service and say, because of a one-off incident, I know, I suspect, I believe, we can predict that you're not going to be able to do your job? The Navy took this to such an extreme, which I say, they don't protest too much. They try to make their case by saying, you know what? You know what the real problem was? She's a cook. She's an assistant cook. She prepares vegetables. Does an ordinary kitchen functions. That means she has access to hot pots and pans and knives. Well, that kind of hyperbole and exaggeration says that they don't really know that they don't have a case. They're overbuilding their case. There was absolute confidence in Ms. Harding as exhibited by two supervisors and the director of food services. And there's nothing other than a conclusory statement, I don't have confidence in you. And again, it's not real. That's the real point. It's not real. Saying it doesn't make it real. And the deciding official abused his discretion. Going back to something else, the sailing case. Here's a super point. Which one of the cases? It's on page A1. The proposal's on A151 and the decision on A156. And here's what's said in some about that case. Which is, you're teaching students. You're teaching midshipmen. You have Ms. Harding's contact was incidental. I mean, she's in the food service hall. She doesn't really interact with midshipmen. Here's somebody who's teaching them, who's guiding them. And both the proposal and the decision are replete with the need to set a good example. And the conduct was? Drunk on the job. And on the job meaning on the boat? On the boat, while he was giving them a briefing. It even says he was giving misinformation to the crew over the VHF radio. That's at 151. I mean, it's so directly involved in his duties. This is the 14-day suspension case. And it's replete with saying, the real problem is you've set an example. And you've violated that. You've set a bad example. Well, guess what the deciding official said in Ms. Harding's case? Virtually the same thing. You're setting a bad example. But what's the rest of the evidence? Nobody knows about this incident. The middies don't know about it. And there was extensive cross-examination about, was there publicity? Was it in the newsletter? Was it gossip? Was it a subject of gossip? And the answer is no. Nobody knew about it. He wasn't piloting the boat, if I understand it. He was there on the boat to do a demonstration of some sort. He wasn't piloting, but the crew was piloting the boat. Under his direction, yes. It's my understanding. They're learning how to sail. He's telling them how to do it. Well, all right. But here's the significant thing, Judge Bryson. It says, she also overheard you giving incorrect and conflicting information to the crew on the VHF radio. That's the risk in this case. That's the, if you want to call it endangerment, that's what it comes from. It's clearly an equivalent case. You see, once again, Sam, almost out of time. Virtually out of time, maybe I should say. In fact, more than out of time. More than out of time. And I apologize. No, no, no. Thank the court for your time and your consideration. Thank you.